**ENERGY TRANSPORTATION
GROUP, INC., Plaintiff,**

v.

**Honorable Samuel K. SKINNER, et
al., Defendants,**

**Argent Marine I, Inc., et al., Cabot LNG
Shipping Corp., and Shell International
Marine Limited, et al., Defendants–Intervenors.**

Civ. A. No. 90–2502.

United States District Court,
District of Columbia.

Nov. 21, 1990.

Samuel Rosenthal, Curtis, Mallet–Prevost, Colt & Mosle, Washington, D.C., for plaintiff.

Madelyn Johnson, U.S. Attorney's Office, Washington, D.C., for Samuel K. Skinner.

William E. McDaniels, Williams & Connolly, Washington, D.C., for the Argent Companies.

Thomas H. Milch, Arnold & Porter, Washington, D.C., for Shell.

Bruce F. Kiely, Tucker Veach, Baker & Botts, Washington, D.C.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

On November 16, 1990, the Court heard argument on the motions of the defendants and defendant-intervenors to dismiss the above-captioned case. The Court granted those motions from the bench and issues this written opinion incorporating its bench ruling.

### FACTS

On October 11, 1990, Energy Transportation Group (ETG), initiated this action against the Secretary of the Department of Transportation (the Secretary) and the Administrator of the Maritime Administration of the United States Department of Transportation (MARAD). The complaint challenges the legality of a settlement agreement entered into between MARAD; Cabot LNG Shipping Corporation (Cabot); Argent Marine I, Inc.; Argent Marine II, Inc.; Argent Marine III, Inc.; Argent Marine Services, Inc.; Argent Marine Operations, Inc.; Argent Chartering I, Inc.; Argent Chartering II, Inc.; Argent Chartering III, Inc.; and Argent Management Company (the Argent companies); and Shell International Marine Limited; Shell Gas Nigeria, B.V.; Shell Bermuda (Overseas) Limited; and Shell International Gas Limited (Shell). The settlement agreement is the result of protracted litigation involving the disposal of three liquified natural gas (LNG) tankers by MARAD. The agreement provides for the sale of one vessel to Cabot, two vessels to the Argent companies, and the time charter of two of the vessels to Shell. The day after ETG initiated this action, Cabot, the Argent companies, and Shell

filed motions to intervene. On October 15, 1990, this Court granted, as unopposed, the motions of Cabot and the Argent companies. On October 24, 1990, the Court granted Shell's opposed motion to intervene, holding that Shell satisfied the requirements for intervention as of right under rule 24(a)(2) of the Federal Rules of Civil Procedure.

This case has as its genesis MARAD's 1986 acquisition of three LNG vessels after the owner/obligor defaulted on loans made pursuant to the Federal Ship Mortgage Insurance program created by Title XI of the Merchant Marine Act of 1936, 46 U.S.C. app. § 1271, *et seq.* Because the vessels were built with Construction Differential Subsidies (CDS), under the Merchant Marine Act they may only be sold to U.S. citizens. MARAD solicited bids for the vessels in April 1986 and April 1987, but was unsuccessful in securing a satisfactory purchaser. In January 1987, Shell inquired about the vessels and MARAD's position regarding options. Shell's interest in the vessels stemmed from its involvement in a project to develop a Nigerian source of natural gas. Shell inspected one of the vessels, the GAMMA, in August 1987.

In September 1987, MARAD issued a third solicitation, seeking bids by October 12, 1987. The solicitation expressly required that bidders must qualify as U.S. citizens under 46 U.S.C. app. § 1244. *Administrative Record in Cabot LNG Corp. v. Skinner, et al.,* No. 89-2711 (A.R. *Cabot*), at 9. On October 9, 1987, Shell submitted a proposal for a three-year purchase option on behalf of a U.S. citizen nominee to be named later. *Id.* at 10. Cabot also expressed interest before the October 12 deadline, but indicated that it was not yet ready to submit a firm bid. *Id.* ETG did not submit a bid or expression of interest in the vessels. On October 16, 1987, MARAD issued a follow-up solicitation, inviting interested parties to submit final offers by October 30, 1987. *Id.* at 11. Cabot again expressed an interest but did not make a firm offer. *Id.* at 12. ETG alleges that it did not receive this solicitation.

On January 14, 1988, MARAD issued another notice to interested parties, indicating that it had reached a "tentative agreement with one of the parties who has been able to meet all of the necessary requirements" and that unless another party could "fully meet the requirements ... by January 22, 1988, Marad could likely accept an offer shortly thereafter." *Id.* at 15. ETG alleges that it did not receive this notice.

Not having received any substantive response to its January 14 notice, MARAD approved Shell's offer on February 17, 1988. MARAD announced that it would award the vessels to a U.S. citizen qualified under § 2 of the Shipping Act of 1916, 46 U.S.C. app. § 802, to be named by Shell. *Id.* at 17. On February 23, 1988, MARAD issued a notice that it had "accepted an offer and the Vessels are no longer available." *Id.* On May 31, 1988, MARAD amended its February 17, 1988 approval of Shell's offer to require the purchase option agreements with the U.S. citizen nominee to be entered into by October 31, 1988. Failing this, Shell would be required to make prepayments of option fees. *Id.* at 24. On June 16, 1988, Cabot submitted a firm offer for the vessels. *Id.* at 28. MARAD responded on July 1, 1988, stating that the vessels were no longer available. *Id.* Shell subsequently named the Argent companies as its U.S. citizen nominees and on October 18, 1988, MARAD and the Argent companies executed the purchase option agreements. *Id.* at 39.

On August 13, 1989, the Maritime Subsidy Board (MSB) approved the transfer of title to the vessels to the Argent companies, subject to the determination of MARAD's chief counsel that the Argent companies were U.S. citizens. *Id.* at 61. Shortly thereafter, Cabot petitioned the Secretary to review the MSB's decision, alleging that the Argent companies were not U.S. citizens and that the bidding procedures had been flawed. The Secretary allowed the time period for review to elapse and Cabot brought suit in this Court. *Cabot LNG Corp. v. Skinner, et al.,* No. 89-2711 (filed September 29, 1989). The Argent companies were permitted to intervene. On October 31, 1989, MARAD initiated an investi-

**4**

gation into the Argent companies' citizenship status. On March 5, 1990, MARAD issued a decision determining that the Argent companies had failed to maintain U.S. citizenship between October 1988 and December 15, 1988. MARAD therefore terminated the option agreements, effective April 5, 1990. The Argent companies appealed this decision to the U.S. Court of Appeals for the District of Columbia Circuit on March 22, 1990. *Argent Marine I, Inc., et al. v. United States*, No. 90–1147 (filed March 22, 1990). Shell did not join the Argent companies in their appeal; rather, it filed a separate lawsuit in this Court on April 4, 1990. *Shell Int'l Marine Limited, et al. v. Maritime Administration of the United States*, No. 90–0788 (filed April 4, 1990). This Court consolidated the *Cabot* and *Shell* cases on April 23, 1990.

Before MARAD issued its March 5, 1990 opinion, ETG had begun to express an interest in the vessels and in the *Cabot* litigation. On February 22, 1990, ETG wrote to the Maritime Administrator, Captain Warren Leback, advising him that ETG would be interested in purchasing the vessels if the sale to the Argent companies were cancelled. ETG stated that it would be willing to negotiate a price of up to $80 million per vessel. ETG's Proposed Findings of Fact and Conclusions of Law, Exhibit 16. Also in February, ETG filed its first motion to intervene in the *Cabot* litigation, alleging an interest in seeing that the vessels not be sold to a foreign competitor or controlled by a foreign competitor. While this motion was pending, MARAD issued its March 5, 1990 opinion that the Argent companies had failed to maintain citizenship. On March 22, 1990, at a status call and hearing on ETG's motion, MARAD represented to this Court that it was interested in rebidding the vessels. The Court then denied ETG's motion in part because of concerns about whether ETG's motion was timely, in part because of concerns about whether ETG had standing, and in part because the government represented to the Court that it would adequately represent ETG's interests.

On April 24, 1990, ETG filed its second motion to intervene, alleging the same interests. On May 17, 1990, the Court again denied ETG's motion on the same grounds of timeliness, standing, and adequate protection of ETG's interests. Meanwhile, ETG also attempted to intervene in the Argent companies' appeal to the District of Columbia Circuit. The appellate court denied intervention on July 16, 1990, on the grounds that ETG had not submitted a timely bid for the vessels and ETG's interests were protected by MARAD's position.

At a July 31, 1990 status conference, the parties to the *Cabot* and *Shell* consolidated action informed the Court that they were in the midst of settlement negotiations. On August 24, 1990, the parties filed a joint status report indicating that they had made substantial progress toward settlement and hoped to execute an agreement by September 12, 1990. ETG was not invited to participate in the settlement negotiations. Its attempts to meet with MARAD to bring about a public rebidding of the vessels or to pursue a purchase of the vessels were unsuccessful. On September 12, 1990, the parties submitted a second joint status report, indicating that settlement was nearly completed. On September 19, 1990, the parties presented the Court with a third status report and accompanying settlement agreement executed the previous day by all of the existing parties. The settlement agreement provides for MARAD to sell two of the LNG vessels to Argent and one to Cabot, for a price of about $15 million per vessel. It also provides for the time charter of two of the vessels to Shell. On October 10, 1990, ETG petitioned the Secretary for a review of MARAD's action. On October 25, 1990, ETG submitted a written bid for the vessels, offering to pay roughly $25 million per vessel. The offer stated that it would remain in effect until November 14, 1990, or the termination of the Secretary's review, whichever was earlier. The Secretary issued an opinion on November 14, 1990, denying review of MARAD's decision to enter into the settlement agreement. The Department of Justice also approved MARAD's entry into the agreement.

In the midst of the parties' settlement negotiations, on August 28, 1990, ETG filed its third motion to intervene. The Court denied this motion on the grounds that ETG lacked "standing to intervene as either a disappointed bidder or a frustrated competitor." *Cabot LNG Corp. v. Skinner, et al.*, No. 89–2711, slip op. at 12 (October 4, 1990). Seven days later, ETG filed this lawsuit.

## DISCUSSION

ETG's amended complaint [1] attacks the legality of the settlement agreement through four separate counts. First, it alleges that MARAD's entry into the settlement agreement on October 18, 1990 was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. Second, it alleges that the settlement would result in *de facto* ownership and control of the vessels by non-U.S. citizens, in violation of the Merchant Marine Act of 1936. Third, it alleges that the settlement agreement would result in an operator of the vessels being a noncitizen, also in violation of law. Finally, it alleges that the Department of Justice's conduct in approving the settlement agreement was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

The defendants make a series of arguments for dismissal of ETG's complaint. First, they argue that ETG lacks standing to bring this complaint, just as it lacked standing to intervene in the litigation that resulted in the settlement agreement now being challenged. Second, they argue that the Secretary has complete discretion under the applicable statute to approve the sale of vessels acquired by default according to whatever terms he sets. Third, they argue that the Hobbs Act, 28 U.S.C. § 2342, vests exclusive jurisdiction over ETG's citizenship challenge in the court of appeals. Fourth, they argue that ETG's challenge to the citizenship of the operator of the vessels is moot because a new U.S.-citizen operator has been named. Finally, they argue that the decision of the Attorney General to approve settlements is nonreviewable because it is committed to the discretion of the executive branch.

### A. *Standing*

■ The parties' dispute over standing is essentially a dispute over how to characterize the settlement agreement and resulting sale. ETG vociferously argues that MARAD's entry into the September 18, 1990 agreement constituted a negotiated sale that was "separate and distinguishable from the 1987–88 bidding and solicitation." ETG Opposition at 2. ETG refers to the settlement agreement as the "1990 sale" and argues that it has standing as both a "disappointed bidder" and as a "frustrated competitor." ETG argues that it is a disappointed bidder because it submitted an expression of interest and an actual bid to MARAD in 1990, both of which were rejected, and because it was precluded from participating in the settlement agreement and resulting negotiated sale. ETG argues that it is a frustrated competitor because it will suffer injury-in-fact by MARAD's sale of the vessels to competitors in the LNG transportation business.

The defendants' arguments start from the opposite premise: that the so-called "1990 sale" arose out of the 1987–88 bidding process and is not a wholly independent transaction. As the Argent companies state in their brief, "[t]he 1990 sale was not created *ex nihilo*." Argent Memorandum at 12. Based on this, the defendants argue that ETG lacks standing as either a "disappointed bidder" or a "frustrated competitor." They argue that ETG cannot be a disappointed bidder because it did not even express interest in the vessels until February 1990; and ETG cannot be a frustrated competitor because its vessels, which are currently committed to long-term contracts shipping LNG between Japan and Indonesia, would not be in direct competition with the three vessels at issue, which

---

1. ETG filed an amended complaint on October 26, 1990, dropping its original Count IV and adding a new Count IV.

**6**

will transport LNG between Africa and the East Coast of the United States. The only competitive injury that ETG might suffer, according to defendants, is that it would be deprived of the opportunity to acquire more vessels than it currently has.

The defendants also argue that ETG does not meet the constitutional requirement for standing set forth in *National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, (D.C.Cir.1987). In that case, the District of Columbia Circuit held that "a litigant must show that he has suffered injury as a result of the defendant's putatively illegal conduct and that his injury both may be traced to the challenged conduct and is likely to be redressed by the judicial relief he seeks." *Id.* at 1234 (citations omitted). Because ETG never expressed any interest in the vessels until February of this year, the defendants argue that any injury ETG may suffer from is a result of its own doing, not of defendants'.

The Court agrees with the defendants' characterization of the settlement agreement and resulting sale. The "1990 sale" did not take place in a vacuum. It was brought about only as a result of the litigation that the parties have been engaged in throughout the last year, and that litigation was brought about only as a result of MARAD's original attempt to dispose of the LNG vessels through its 1986, 1987, and 1988 solicitations. Although ETG claims that it did not receive all of MARAD's solicitations, it does not dispute that it received some of them and was aware that the vessels were up for bid. ETG apparently made a decision not to submit a bid or even a serious expression of interest. It is evident from the repeated solicitations that MARAD had great difficulty disposing of the vessels during this bidding process. In the intervening years, changes in worldwide energy supply and demand caused an escalation in the value of the vessels. In the last year, ETG has repeatedly expressed its interest in purchasing the vessels at a higher price than that previously offered by Shell, Cabot, or the Argent companies, and at a higher price than the set-

tlement agreement provides for. ETG has nevertheless been foreclosed from the so-called "1990 sale." The Court is aware of ETG's recently submitted bid for the vessels, but the Court finds this bid meaningless: ETG cannot today bootstrap itself into having standing that it never previously had.

The Court's standing analysis must begin with a discussion of *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in which the U.S. Supreme Court enunciated a two-part test for standing to challenge an administrative decision. First, the plaintiff must establish that "the challenged action has caused him injury in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829. Second, the "interest sought to be protected by the complainant" must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830. More recently, the Supreme Court has clarified the zone of interests test, describing it as "a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Clarke v. Securities Industry Association*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

### 1. Disappointed Bidder Standing

In an attempt to apply the Supreme Court's standing analysis to government contracts cases, this Circuit has developed a doctrine by which a "disappointed bidder in a government contract award has standing under section 702 of the APA, 5 U.S.C. § 702, to act as a 'private attorney general,' in order to 'prevent[ ] the granting of [a] contract[ ] through arbitrary or capricious action' amounting to 'illegal [agency] activity.' " *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1052 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990) (citing *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir.1970)). To avoid "nuisance suits" that "could hand-

icap the procurement system," disappointed bidder standing is "conferred only to those bidders who are 'within the zone of active consideration' for the bid's award." *Id.* (citing *National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237–38 n. 12 (D.C.Cir.1987) (other citations omitted)). As this Court held when it denied ETG's third motion to intervene in the *Cabot* and *Shell* cases, "ETG cannot have standing as a disappointed bidder because it wasn't a bidder at all." *Cabot LNG Corp. v. Skinner, et al.*, No. 89–2711, slip op. at 9 (October 4, 1990).

ETG argues that it is a disappointed bidder because it expressed an interest in the vessels in February 1990 and submitted a bid in October 1990. As the Court has already stated, however, these efforts were meaningless because the 1990 sale cannot be considered as wholly separate from the 1986–88 bidding process. The only parties with standing to challenge that bidding process were disappointed bidders such as Cabot. Similarly, the only parties with standing to challenge the settlement of a dispute over the bidding process are disappointed bidders from that bidding process. ETG is not such a disappointed bidder.

ETG also argues that it was precluded from participating in the 1990 sale. It seeks to be treated like the plaintiffs in *Coalition for the Preservation of Hispanic Broadcasting v. Federal Communications Commission* (FCC), 893 F.2d 1349 (D.C.Cir.1990). In that case, this Circuit held that three competitors for broadcast licenses had standing to challenge a settlement of a license renewal dispute. The critical difference, however, is that in *Hispanic Broadcasting*, the three competitors had filed timely applications for the broadcast license at issue and the settlement was approved anyway, precluding the applicants from being considered. In this case, ETG *never* bid or expressed an interest in bidding until February 1990, well after the bidding was closed and the *Cabot* litigation had begun. It was never precluded from being considered as a purchaser of the vessels during the 1986–88 bidding process.

ETG cites *Abel Converting, Inc. v. United States*, 679 F.Supp. 1133, 1137 (D.D.C. 1988), and *Aero Corp. v. Dep't of the Navy*, 540 F.Supp. 180 (D.D.C.1982), for the proposition that a party excluded from a negotiated sale has standing to challenge that sale. These cases are distinguishable. In *Abel*, government procurement regulations required open competition and notice to incumbent contractors. Plaintiffs were incumbent contractors who did not receive notice of the General Services Administration's (GSA) solicitation for bids for a two-year contract for paper towel products. The court determined that plaintiffs suffered " 'injury as a result of the defendant's putatively illegal conduct' " and their " 'injury both [could] be traced to the challenged conduct and [was] likely to be redressed by the judicial relief [sought]' " 679 F.Supp. at 1137 (citing *National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, 1234 (D.C.Cir.1987)).

In *Aero Corp.*, the Armed Services Procurement Act (ASPA) did not require formal advertising but did require that procurements "be awarded on the basis of competitive negotiation with all qualified potential contractors" if possible. 540 F.Supp. at 182–83 (D.D.C.1982) (citing 10 U.S.C. § 2304(g)). Regulations promulgated under the ASPA provided that " '[n]egotiated procurements shall be on a competitive basis to the maximum practical extent.' " *Id.* at 183 (citing 39 C.F.R. parts 1–39, vol. 1, at 327 (1979)). Despite these statutory and regulatory requirements, the Navy awarded a series of contracts for the overhaul of 49 propeller-driven C–130 airplanes to Lockheed–Georgia Corporation without engaging in any competitive negotiation. The court granted a preliminary injunction, holding that the plaintiff, a competitor in the field of performing maintenance service on C–130 aircraft, was likely to succeed on the merits. The court held that Aero Corp. had standing because it was denied the opportunity to compete for the contracts in violation of the statute. The Acting Comptroller–General had submitted an opinion at the court's request,

**8**

finding that the Navy had erred in determining that competition was impossible and choosing to engage in sole-source procurement from Lockheed. *Id.* at 188–89. Because Aero Corp. had been completely denied *any* chance to compete for the contracts, the court reasoned that:

> [Aero's] interest is the interest in competition *vel non,* not competition in which a particular firm is favored. There is, then, no divergence in the interests of Aero and the public under ASPA on the facts Aero pleads: to grant relief vindicating Aero's asserted interest in competition would presumably also vindicate the coincident public interest in competitive procurement under section 2304(g).

540 F.Supp. at 203.

The case now before the Court is distinguishable from both *Abel* and *Aero Corp.* for two reasons. First, the statutory requirements at issue in this case are quite different from those in *Abel* and *Aero Corp.* Section 1105(c) of the Merchant Marine Act of 1936, 46 U.S.C. app. § 1275(c), grants the Secretary of Transportation extremely broad discretion to sell vessels acquired through default under the Federal Ship Mortgage Insurance program, 46 U.S.C. app. § 1271 *et seq.* The pertinent statutory language provides:

> *Notwithstanding any other provision of law* relating to the acquisition, handling, or disposal of property by the United States, the Secretary shall have the right, in his discretion, to complete, recondition, reconstruct, renovate, repair, maintain, operate, charter, or sell any property acquired by him pursuant to a security agreement with the obligor or may place a vessel in the national defense reserve. *The terms of the sale shall be as approved by the Secretary.*

46 U.S.C. app. § 1275(c) (emphasis added). The defendants and the Secretary, in his November 14, 1990 opinion, interpret this statute to permit the disposal of repossessed vessels without engaging in competitive bidding. They point out that the

mortgage insurance program was added to the Merchant Marine Act in 1938. From 1953 to 1972, § 1105(d) of the Act was substantially the same as § 1105(c) is today. The difference was that, instead of the present sentence permitting the Secretary to set the terms of the sale, the section continued with *"or* may sell the same [repossessed vessels] upon competitive bids for not less than the minimum sales price provided by the Merchant Marine Act, 1936, as amended," (emphasis added). In 1972, Congress deleted this clause and inserted the sentence providing that "[t]he terms of the sale shall be as approved by the Secretary." Ship Financing Act of 1972, Pub.L. No. 92–507, 86 Stat. 909, 914.

■ The defendants and the Secretary also stress that even before 1972, the Secretary [2] had the discretion to dispose of repossessed vessels by means of negotiated sale without competition. This is based in part on a Legal Opinion issued on January 24, 1966, by the then general counsel of MARAD. In that opinion, the general counsel, Carl Davis, stated that he believed the former version of the section conferred *additional* authority on the Secretary to sell repossessed property through competitive bidding, not that it restricted his authority to competitive bidding. He concluded by stating that former § 1105(d) of the Merchant Marine Act of 1936 granted "ample authority to dispose of foreclosed Title XI vessels in any manner in which the Secretary, in his discretion, may deem proper." Administrative Record in *Energy Transportation Group, Inc. v. Skinner, et al.,* No. 90–2502 (A.R. *ETG*) at 5616. Mr. Davis also submitted an affidavit stating that during his tenure as general counsel, MARAD generally disposed of repossessed vessels "on a negotiated basis, without public advertisement or competitive bids." A.R. at 5730 (affidavit of Carl C. Davis dated October 29, 1990). Mr. Davis' affidavit also states that it was his opinion that such negotiated sales were fully authorized by the Act.

**2.** At the time it was the Secretary of Commerce, rather than of Transportation, who had the discretion.

ETG points to an entirely different statute for its proposition that MARAD acted in violation of law by not rebidding these vessels.[3] ETG argues that the Federal Property and Administrative Services Act (FPASA), 40 U.S.C. § 471 *et seq.*, requires "surplus property" to·be disposed of after public advertising for bids. *Id.* at § 484(e). The Act also provides that "[t]he authority conferred by this Act shall be in addition and paramount to any authority conferred by any other law and shall not be subject to the provisions of any law inconsistent herewith...." *Id.* at § 474. As the defendants point out, however, § 474 of the Act continues by providing that "[n]othing in this Act shall impair or affect any authority of— ... the United States Maritime Commission with respect to the ... sale, lease, or charter of any merchant vessel...." *Id.* at § 474(16). The only restriction on MARAD is that it "shall to the maximum extent that it may deem practicable, consistent with the fulfillment of the purposes of such programs and the effective and efficient conduct of such activities, coordinate its operations with the requirements of this Act...." *Id.*

ETG argues that this restrictive language means that MARAD may not engage in a negotiated sale unless the Secretary determines that it is not practicable to competitively bid the property. This is clearly what the regulations at issue in *Aero Corp.* required of the Navy, but it is not what is required of the Secretary. In *Aero Corp.*, the regulations required the contracting officer to assure " 'that competitive procurement is not feasible' " before engaging in a noncompetitive procurement. 540 F.Supp. at 183 (citing 32 C.F.R. parts 1–39, vol. 1, at 327 (1979)). No statute or regulation requires such a determination by the Secretary. ETG nevertheless points to the legislative history of the FPA-

SA to show that Congress intended the Secretary to make this determination before disposing of property without competition.. In the House Report on the bill, Congress wrote:

> [I]t is expected that [the Secretary] will as far as practicable procure, utilize, and dispose of property in·accordance with the provisions of the act and the regulations issued thereunder, particularly so far as common-use items and administrative supplies are concerned....
>
> In other words, to the extent that compliance with the act and submission to the jurisdiction of the Administrator will not so "impair or affect the authority" of the several agencies to which the subsection applies as to interfere with the operation of their programs, the act will govern.

H.R.Rep. No. 670 81st Cong., 1st Sess. (1949) *reprinted in* 1949 U.S.Code Cong. & Admin.News 1475, 1504. The language relied on by ETG does not support its argument. It imposes no affirmative duty on the Secretary or MARAD to make a determination of impracticability. Nor does it require the Secretary or MARAD to engage in competition simply because it is practicable. It allows the Secretary discretion to determine whether competition will "interfere with the operation of [the agency's]· programs." In his November 14, 1990 opinion, the Secretary found that it was in MARAD's discretion to determine whether compliance with the FPASA was "practicable" and there was no error in its determination that "the effective and efficient conduct of [its] activities" warranted bringing this costly and lengthy litigation to a close by approving the sale of the vessels pursuant to the settlement agreement. A.R. *ETG* at 6013.[4]

ETG also relies on a decision of the Comptroller General holding that the par-

---

**3.** ETG also argues that MARAD is required to rebid the vessels by virtue of MARAD's prior representations to the Court that it intended to rebid the vessels. The Court does not find it unusual for parties to change their positions during the course of litigation, particularly when the parties choose to settle. The Court will not hold the Secretary bound by the representations of MARAD's counsel before the deci-

sion was made to resolve the litigation through settlement.

**4.** The Court might add that the sale of three LNG vessels worth millions of dollars is hardly similar to the sale or purchase of "common-use items and administrative supplies," as referred to.in the House Report.

10

tial exclusion from the FPASA contained in § 474(16) did not permit MARAD to neglect to inform a competitor that the requirements for certain contract proposals had been relaxed. *See Coflexip & Services Inc.*, No. B–216634, 85–1 CPD ¶ 554 (May 16, 1985). The Comptroller General based his decision in part on the fact that "there [was] no indication that MARAD ever determined that it would be impracticable to comply with competitive procurement requirements." *Id.* at 11. The distinction between *Coflexip* and the case now before the Court is basic. *Coflexip* did not involve the sale of property repossessed pursuant to Title XI of the Merchant Marine Act. Thus, MARAD's actions in *Coflexip* were not pursuant to § 1105(c) of that Act, which provides that the Secretary may set the terms of the sale of repossessed property "[n]otwithstanding any other provision of law." 46 U.S.C. app. § 1275(c).

Not surprisingly, the defendants argue that § 1105(c) trumps the provisions of the FPASA establishing a preference for competition. Their argument is supported by this court's recent decision in *Liberty Maritime Corp., et al. v. United States*, No. 88–3185 (filed February 6, 1990), (Gasch, J.), (appeal docketed February 14, 1990). In that case, the plaintiffs argued that MARAD violated a provision of the Merchant Marine Act mandating a price floor for selling CDS-built vessels. MARAD and the defendant purchasers of the vessels argued that § 1105(c) superseded any other provisions of the Act due to its "notwithstanding" clause. The court first conducted a facial interpretation of the competing provisions and determined that § 1105(c) was indeed controlling:

> Although this Court is aware of no judicial interpretations of the "notwithstanding" clause of section 1105(c), the Court of Appeals has frequently held that the phrase "notwithstanding any other provision of law," or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws.

No. 88–3185, slip op. at 13 (citing numerous D.C. Circuit cases). The court then looked at the legislative history of both provisions.

Determining that they were somewhat ambiguous, the court deferred to the agency's interpretation of its statute, finding it to be " 'reasonable and consistent with the statutory purpose.' " *Id.* at 20 (quoting *Ohio v. United States Department of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989), and relying on *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

In the case now before the Court, the defendants and the Secretary assert that it has long been the practice of MARAD to dispose of repossessed vessels through negotiated sales rather than competitive bidding. They argue that this longstanding practice of the agency is entitled to deference. *See American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1577 (Fed.Cir.1987). The Court does not find their interpretation unreasonable, particularly in light of the various amendments and deletions to the statute. Certainly their interpretation of the statute serves to distinguish this case from *Abel* and *Aero Corp.*, which involved much less ambiguous statutory and regulatory requirements.

Another distinction between those cases and this one is that to the extent the public has an interest in competition, as the court stated in *Aero Corp.*, that interest was vindicated by MARAD's 1986–88 solicitation for bids. MARAD did not initially make a decision to sidestep competitive bidding. Its decision not to rebid the vessels was made after having engaged in competitive bidding, fought through over a year of litigation, and entered into a settlement of that litigation which provides for the rapid return of three LNG vessels to waterborne commerce. Considering these factors as well as the many cases on the subject, the Court cannot find that ETG was either a disappointed bidder or was precluded from bidding on the vessels now at issue.

### 2. Frustrated Competitor Standing

■ ETG argues that it has standing to bring this complaint because it is a "frustrated competitor" that will suffer injury in fact by virtue of MARAD's award of the three LNG vessels to Cabot and the Argent

companies. Although the Court agrees that ETG may have standing to challenge MARAD's determination that Cabot and the Argent companies are U.S. citizens, its alleged injury based on competition does not give it standing to challenge MARAD's entry into the settlement itself. The cases cited by ETG to support its standing as a frustrated competitor are not typical government contracts cases; they do not involve a challenge brought by a party who wants to be considered for the award of a government contract. Because of this, they are not cases in which the courts have had to use the "disappointed bidder" test for standing.[5] Standing in these cases does not depend upon whether the plaintiff was in the "zone of active consideration" for a contract. Rather, standing in these cases is based simply upon the Supreme Court's two-part test in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970): whether the plaintiff can show "injury in fact" resulting from the challenged action and whether the interest the plaintiff seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152–53, 90 S.Ct. at 829–30.

ETG cites *Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814 (D.C.Cir.1979), *reversed on other grounds*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980) for the proposition that head-to-head competition is not necessary to have standing as a frustrated competitor. Although the majority does not mention standing in that case, the dissenting judge, in a footnote, states that he assumes "the only 'injury in fact' which appellants can allege is the harm from 'additional competition.'" *Id.* at 843 n. 16. *Alaska Bulk Carriers* was a challenge to MARAD's decision to permanently remove the statutory bar to using construction-subsidized vessels in domestic maritime trade. Such vessels had been restricted to use in foreign trade, where they would not com-

pete with nonsubsidized vessels. Plaintiffs were carriers who operated their nonsubsidized vessels in domestic trade. Assuming the dissent was correct that standing was based on the harm plaintiffs would suffer as a result of increased competition, ETG's argument appears to be that it too has standing on similar grounds. ETG ignores the distinguishing factor: *Alaska Bulk Carriers* did not involve a government contracts dispute. The court in that case did not have to determine whether plaintiffs were disappointed bidders. Moreover, the harm in *Alaska Bulk Carriers* stemmed from the agency's action in lifting the statutory bar. The alleged harm to ETG from increased competition in the LNG transportation business stems from ETG's own failure to bid on the vessels in a timely fashion. To this extent, the defendants are correct that under the standard set forth in *National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, (D.C.Cir.1987), ETG has not shown "that [it] has suffered injury as a result of the defendant's putatively illegal conduct and that [its] injury both may be traced to the challenged conduct and is likely to be redressed by the judicial relief [it] seeks." *Id.* at 1234 (citations omitted).

ETG also relies on *Waterman Steamship Corp. v. Burnley*, 691 F.Supp. 1524 (D.D.C.1988), to support its frustrated competitor argument. Again, however, that case did not involve a government contracts dispute. In *Waterman Steamship*, the holder of an operating-differential subsidy (ODS) contract with the United States challenged MARAD's sale of certain rights to CGL, a common carrier that operated ships under the U.S. flag but was not a subsidy recipient. The rights, called "section 615 rights," enable a holder to obtain ODS contracts, provided that the holder meets certain criteria. They also make the holder eligible for federal preference cargoes without the normal three-year waiting period for newly documented U.S.-flag ships. Waterman contended that the

---

5. Courts have sometimes struggled with how the disappointed bidder test fits into traditional notions of standing. As the D.C.Circuit stated in *National Federation of Federal Employees v. Che-* ney, "courts have applied disappointed bidder status to meet both Article III injury requirements and zone of interest requirements." 883 F.2d at 1053 (footnotes omitted).

rights were not intended to be sold, but were intended to be made available to subsidized U.S.-flag vessel operators. CGL argued that Waterman had no standing because it had never applied for section 615 rights. The court nevertheless found standing because CGL, by virtue of the rights it had bought, had indicated that it intended to use the new vessels to compete on Waterman's trade routes. The court found that "the threatened competition for its essential cargoes [was] sufficient to satisfy the injury-in-fact requirement for standing." *Id.* at 1531. The court then went on to determine that the relevant act, 46 U.S.C. app. § 1185, was intended to protect all ODS holders or U.S.-flag carriers eligible to receive ODS contracts, thus Waterman was within the zone of interests protected by the act.

The difference between *Waterman Steamship* and the present case is manifest: *Waterman Steamship* was not brought by a plaintiff seeking to obtain a government contract. Like the plaintiffs in *Alaska Bulk Carriers*, Waterman did not have to show that it was a disappointed bidder or had "placed [itself] in the special relationship by which the government can bind [it] to the bid." *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1053 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990). Nor did it have to show that it had been "within the zone of active consideration." *Id.* ETG is a plaintiff seeking to obtain a government contract, specifically, a contract to purchase three LNG vessels. It has no standing to challenge the sale of those vessels because it never made a timely bid for them. Accordingly, the Court shall dismiss Count I of ETG's complaint.

**B.** *Jurisdiction*

Count II of ETG's complaint alleges that the settlement agreement would result in *de facto* foreign ownership of the vessels in violation of the Merchant Marine Act. Citizenship for purposes of this Act is to be

determined in accordance with § 2 of the Shipping Act of 1916, 46 U.S.C. app. § 802. MARAD determined that the citizenship test had been met when it entered into the settlement agreement. The Secretary denied review of this determination. Accordingly, under 28 U.S.C. § 2342, the court of appeals "has exclusive jurisdiction to enjoin, set aside, suspend . . . or to determine the validity of— . . . all rules, regulations, or final orders of— . . . the Secretary of Transportation issued pursuant to section 2 . . . of the Shipping Act, 1916. . . ."

■ Defendants argue, and the Court agrees, that this Court lacks jurisdiction over Count II of ETG's complaint because jurisdiction is vested exclusively in the courts of appeals. ETG has attempted to sidestep the jurisdictional bar by arguing that it is not challenging the validity of MARAD's determination, but rather is challenging the validity of MARAD's process in reaching this determination. The Court believes this is a distinction without a difference. To determine the validity of MARAD's citizenship determination, the court of appeals must *a fortiari* determine the validity of the process used to make that determination. Thus, the Court shall dismiss Count II of ETG's complaint for lack of subject matter jurisdiction.[6]

**C.** *Mootness*

In Count III, ETG alleges that the settlement agreement would result in the vessels being operated by a foreign operator, in violation of the Merchant Marine Act. ETG has conceded, however, that Cabot would be using a U.S. citizen operator, Keystone, rather than the foreign operator, Gotaas–Larsen, as originally planned. Thus, the Court shall dismiss Count III as moot.

**D.** *Reviewability*

In Count IV, ETG challenges the Department of Justice's (DOJ) approval of the settlement as arbitrary and capricious. The defendants argue that ETG does not

---

**6.** At oral argument, counsel for ETG requested the Court transfer Count II to the Court of Appeals. The Court denied that request.

have standing to make this challenge for the same reasons it does not have standing to challenge MARAD's entry into the settlement agreement. Alternatively, they argue that the approval is not subject to judicial review because the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The federal defendants argue that the decision not to press on with litigation is analogous to the decision not to prosecute, which is committed to the discretion of the executive branch.

■ The Court agrees that ETG lacks standing to bring this Count, but for different reasons than those asserted by the defendants. Although ETG may suffer injury in fact from MARAD's sale of the vessels to Cabot and the Argent Companies, ETG has pointed to no relevant statute that could have been intended to protect ETG's interests. The discretion to conduct litigation is committed to the DOJ, under the direction of the Attorney General, by statute. 28 U.S.C. § 516. *See also* 28 U.S.C. §§ 517–519. ETG has not shown that this statute was in any way intended to protect third parties who are dissatisfied with the way that discretion is exercised. It has offered no argument for how the statute could be intended to protect a third party who seeks to challenge a settlement agreement among unrelated parties. Accordingly, the Court cannot find that ETG is within the zone of interests sought to be protected by the relevant statute.[7]

■ More significantly, ETG has not provided the Court with any standards by which it could determine whether the DOJ acted in a manner that was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, provides two exceptions to the reviewability of agency action. The first is when the statute itself precludes judicial review and the second is

when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In this case, the relevant law clearly commits the conduct of litigation to the agency's discretion. Even though Congress has not affirmatively precluded judicial review, it has provided no "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Without such a standard, "it is impossible to evaluate agency action for 'abuse of discretion.'" *Id.*

The Court agrees with defendants that the decision to settle litigation or approve the settlement of litigation to which the United States is a party is akin to an agency's decision not to institute enforcement proceedings or a prosecutor's decision not to prosecute. The Supreme Court has held that the latter two decisions are not subject to judicial review. *Id.* 105 S.Ct. at 1655–56. This Circuit has also recognized the breadth of discretion granted to the Attorney General under 28 U.S.C. §§ 516–519. *See Falkowski v. Equal Employment Opportunity Commission, et al.,* 783 F.2d 252 (D.C.Cir.) (refusal of DOJ to provide appellant with counsel not subject to judicial review), *cert. denied,* 478 U.S. 1014, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986); *Booth v. Fletcher,* 101 F.2d 676, 681–82 (D.C.Cir.1938), *cert. denied,* 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939). Because there are no standards by which the Court could evaluate the DOJ's exercise of discretion in approving MARAD's entry into the settlement agreement, the Court shall dismiss Count IV of ETG's complaint as non-reviewable.

## CONCLUSION

For the reasons discussed above, the Court shall dismiss Counts I, III, and IV of ETG's complaint with prejudice and shall

---

7. ETG points to the Federal Claims Collection Standards as restricting the DOJ's discretion. These standards, set forth at 4 C.F.R. § 103.1 *et seq.* and 4 C.F.R. § 104.1 *et seq.,* apply to the administrative collection, compromise, termination or referral of civil claims by the U.S. government for money or property. They do

not apply to the settlement of litigation involving injunctive relief. Although MARAD had previously counterclaimed against the Argent companies for termination payments, those claims were an extremely minor part of the litigation, which was primarily for injunctive and declaratory relief.

dismiss Count II without prejudice to refile in the court of appeals.