**LIBERTY MARITIME CORPORATION, et al., Appellants,**

v.

**UNITED STATES of America, et al.**

**OMI CORPORATION, et al., Appellants,**

v.

**UNITED STATES of America, et al.**

Nos. 90–5051, 90–5101.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1991.

Decided March 8, 1991.

Michael Joseph, with whom Alex Blanton and Joseph O. Click were on the joint brief, for appellant Liberty Maritime Corp. in No. 90–5051. Glenn P. Harris, Washington, D.C., also entered an appearance for appellant.

Jonathan Blank and John Longstreth, Washington, D.C., were on the joint brief, for appellants OMI Corp. and Seafarers Intern. Union in No. 90–5101.

Jeffrey T. Sprung, Asst. U.S. Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Dept. of Justice, Washington, D.C., were on the brief, for Federal appellees in both cases.

Richard H. Saltsman, with whom Roy G. Bowman, Washington, D.C., was on the brief, for appellees Belmont VLCC I, Inc., Belmont VLCC II, Inc., and Belmont VLCC III, Inc., in both cases.

Before WALD, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Circuit Judge BUCKLEY.

WALD, Circuit Judge:

Liberty Maritime Corporation and OMI Corporation ("Appellants") challenged the Secretary of Transportation's ("the Secretary") sale of three repossessed vessels to private defendants ("Belmont"). The Secretary acquired the vessels as defaulted collateral under the Ship Mortgage Insurance Fund program in Title XI of the Merchant Marine Act, 1936, as amended ("the Act"). See 46 U.S.C. App. §§ 1271–1280 (Supp.1989). Appellants asserted in district court that the Secretary violated two limitations on his sales authority contained in other provisions of the Act: § 705, which establishes a minimum price for the sale of vessels constructed with subsidies, and § 508, which imposes restrictions on competition in foreign commerce for vessels sold for scrap. Appellants alleged economic damage as a result of the sale, claiming that the sale of the vessels resulted in a subsidy to Belmont, which allowed Belmont to bid below the appellants for a contract to carry preference cargo under the Cargo Preference Act of 1954. 46 U.S.C. App. § 1241(b) (Supp.1989).

The district court found that § 1105(c) of the Act grants the Secretary broad discretion to sell vessels repossessed under Title XI at any price and under any terms it deems appropriate. Therefore, the Secretary did not violate § 508 or § 705 of the Act when it sold the vessels to Belmont. See Liberty Maritime Corp. v. United States, Civ.Action No. 88–3185, Memorandum Opinion ("Mem. op.") at 20. We agree. Because we find that there was no subsidy involved in the sale, we also reject appellants' Cargo Preference Act claim of economic harm. Accordingly, we affirm the district court's dismissal of the complaint on all counts.

I. STATUTORY FRAMEWORK

Congress enacted the Merchant Marine Act to "foster the development and encourage the maintenance" of a merchant marine in the United States for domestic and foreign trade and military support. 46 U.S.C. App. § 1101. The Act aims to place "American shipowners on a parity with their foreign competitors, by equalizing the higher cost of building ships in the United States and operating them under American registry." S.Rep. No. 1721, 74th Cong., 2d Sess. 22 (1936). The statute provides government subsidies, as well as government-backed investments, to encourage the construction and operation of ships in the United States. The provisions of the Act at issue in this case include § 508 under Title V, § 705 under Title VII, and § 1105(c) under Title XI.

Title V of the Act provides subsidies for the price of vessels constructed specifically for a United States citizen who has applied to the Secretary for construction of a new vessel for use in foreign commerce. See 46 U.S.C. App. §§ 1151–1161. Upon granting the application, the Secretary contracts with an American shipyard for the construction of the vessel for the purchaser. See 46 U.S.C. App. § 1152(a). The Secretary then sells the vessel to the purchaser at a price below the construction cost representing the difference between the actual cost of building a vessel in the United States and the estimated cost of building

the same vessel in a foreign shipyard. *See* 46 U.S.C. App. § 1152(b). The difference between the actual cost of construction and the sale price is called a "construction-differential subsidy" or "CDS." *Id.* The Secretary also places a lien on the remainder of the purchase price owed by the purchaser to protect the government's interest in the payment of the balance. *See* 46 U.S.C. App. § 1153.

When a vessel becomes obsolete, the owner may apply to the Secretary to replace it with a newly constructed vessel. *See* 46 U.S.C. App. § 1157. Section 508 authorizes the Secretary to scrap or sell the old vessel, and then to authorize construction of a replacement vessel, after the Secretary has determined that the old vessel "is of insufficient value for commercial or military operation to warrant its further preservation."[1] 46 U.S.C. App. § 1158. In the event the purchaser of the old vessel decides not to scrap it, the purchaser must agree not to use that vessel to compete with U.S.-flag vessels in foreign commerce for ten years. *Id.*

Under Title VII the Secretary may directly acquire new or reconditioned vessels, constructed specifically for the government, and then charter or sell them. *See* 46 U.S.C. App. §§ 1191–1206. Under § 705 the Secretary cannot sell an acquired vessel for less than the vessel's depreciated estimated foreign cost.[2] *See* 46 U.S.C.

App. § 1195. Section 705 applies to vessels that have been newly constructed under Title VII or built under Title V and then repossessed because of the buyer's default on the Title V lien. *See* S.Rep. No. 724, 76th Cong., 1st Sess. 11–12 (1939); H.R. Rep. No. 824, 76th Cong., 1st Sess. 10 (1939).

Title XI establishes a government loan guarantee program to encourage private investment in the construction and rebuilding of ships. *See* 46 U.S.C. App. §§ 1271–1280. As originally enacted, Title XI allowed the government to insure loans from private lenders to ship purchasers for the purchase price of the vessel. In 1972, Congress changed the nature of the government's participation from insurance to guaranteed bonds. *See* Pub.L. No. 92–507, 86 Stat. 909 (1972). Under the current statutory scheme of Title XI, the purchaser issues a bond to the bondholder, who in turn pays the purchase price for the ship. The bond is guaranteed by the government, and in the event of default, the bondholder may pursue the government for its claim. *See* 46 U.S.C. App. § 1274(a). The government holds a security interest in the purchased vessel in the form of a mortgage and may foreclose on that security interest when the buyer defaults. *See* 46 U.S.C. App. §§ 1273(b), 1275. Title XI established the Federal Ship Financing Fund as a revolving fund to pay claims on the guaran-

---

**1.** Section 508 states in full:

If the Secretary of Transportation shall determine that any vessel transferred to the Maritime Administration of the Department of Transportation, ... or hereafter acquired, is of insufficient value for commercial or military operation to warrant its further preservation, the Secretary of Transportation is authorized (1) to scrap said vessel, or (2) to sell such vessel for cash, after appraisement and due advertisement, and upon competitive sealed bids, ... *Provided,* That the purchaser thereof shall enter into an undertaking with sureties approved by the Secretary of Transportation that such vessel shall not be operated in the foreign commerce of the United States at any time within the period of ten years after the date of the sale, in competition with any other vessel owned by a citizen or citizens of the United States and registered under the laws thereof. .

46 U.S.C. App. § 1158.

**2.** Section 705 states, in pertinent part:

It shall be the policy of the Secretary of Transportation to encourage private operation of each essential steamship line now owned by the United States by selling such lines to citizens of the United States.... No vessel constructed under the provisions of this chapter, as amended, shall be sold by the Secretary of Transportation for operation in the foreign trade for a sum less than the estimated foreign construction cost exclusive of national defense features (determined as of the date the construction contract therefor is executed) less depreciation based on a twenty-five-year life, nor shall any vessel be sold by the Secretary of Transportation for operation in the domestic trade for a sum less than the cost of construction in the United States exclusive of national defense features less depreciation based on a twenty-five-year life.

46 U.S.C. App. § 1195.

teed bonds. *See* 46 U.S.C. App. § 1272. In order to maintain the solvency of the fund, Congress gave the Secretary the authority to collect fees and sell repossessed vessels and deposit the proceeds into the fund. This authority is set forth in § 1105(c):

> ... Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of property by the United States, the Secretary shall have the right, in his discretion, to complete, recondition, reconstruct, renovate, repair, maintain, operate, charter, or sell any property acquired by him pursuant to a security agreement with the obligor or may place a vessel in the national defense reserve. The terms of the sale shall be as approved by the Secretary.

46 U.S.C. App. § 1275(c).

## II. Factual Background

This case involves the sale of three U.S.-flag oil tankers by the Secretary under Title XI of the Merchant Marine Act. The original shipowner purchased the vessels in 1972, financed in part by a construction subsidy under Title V, with the remainder of the purchase price funded with bonds guaranteed by the United States under Title XI. In return for the guarantee of the bonds, the United States held a security interest in the form of a first preferred mortgage on each vessel. As a result of the owner's default on the Title XI guaranteed bonds, the Secretary acquired the vessels. The Secretary solicited bids for the sale of the vessels, and sold all three vessels to Belmont for less than the vessels' scrap value and significantly less than the minimum price computed under § 705 of the Act. Belmont was the highest bidder that agreed to keep all three vessels in continued operation.

Appellants brought suit in the district court claiming that the sale to Belmont violated the minimum price requirement of § 705 and the noncompetition requirement of § 508. Appellants contended that the sale, without restrictions on price or competition, enabled Belmont to submit the lowest bid for a "preference cargo" [3] contract in competition with appellants. Appellants allege that this "unfair competition" resulted in economic injury to them. Underlying their claim is the assertion that § 1105(c) does not preempt other provisions of law in the Merchant Marine Act, such as § 508 and § 705. The district court rejected all of appellants' assertions, denied appellants' motion for partial summary judgment, and granted defendants' motion for summary judgment, dismissing appellants' complaint on all counts. Mem. op. at 20. Appellants now appeal the district court's decision.

## III. Discussion

■ The Secretary asserts that § 1105(c) grants the Secretary "discretion" to dispose of vessels acquired under Title XI "notwithstanding any other provision of law" and that such discretion allows him to sell Title XI vessels at a price and for terms that may not conform to other provisions within the Act. On its face, the "notwithstanding" clause appears to give the Secretary the broadest possible discretion. This court has interpreted similar "notwithstanding" language in other cases to supersede all other laws, stating that "[a] clearer statement is difficult to imagine." *Crowley Caribbean Transport, Inc. v. United States,* 865 F.2d 1281, 1283 (D.C.Cir.1989) (quoting *Illinois National Guard v. Federal Labor Relations Authority,* 854 F.2d 1396, 1403 (D.C.Cir.1988)); *see also Colorado Nurses Ass'n v. FLRA,* 851 F.2d 1486, 1489–90 (D.C.Cir.1988).

Appellants contend, however, that the "notwithstanding" clause only preempts laws relating generally to the sale of property by the United States, not to provisions in the Merchant Marine Act relating specifically to the sale of vessels. According to appellants, the Secretary's authority to sell repossessed vessels under Title XI allows the Secretary to override other general laws relating to property disposition, but it does not allow the Secretary to override

---

**3.** The Cargo Preference Act of 1954 reserves half of all government-impelled grain cargos to "privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates...." 46 U.S.C. App. § 1241(b).

specific provisions elsewhere in the Act governing maritime policy. Such a reading fights the plain terms of § 1105(c) and essentially appends to the "notwithstanding" clause the proviso: "except that the provisions of law in this Act which relate to the disposition of vessels *do* apply."[4]

The legislative history and the structure and purpose of the Act support the Secretary's interpretation of its plain language. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C. Cir.1989).

In 1953, Congress amended § 1105[5] to restrict the sale of mortgaged vessels to "competitive bids for not less than the min-

imum sales price provided by the Merchant Marine Act, 1936, as amended." Pub.L. No. 83–288, 67 Stat. 626 (1953). Then, in 1972, when the government backing under Title XI was changed from insurance to guaranteed bonds, Congress deleted the minimum price restriction from § 1105(c) and added "[t]he terms of the sale shall be as approved by the Secretary of [Transportation]." Pub.L. No. 92–507, 86 Stat. 909 (1972). Both the deletion and addition appear to be complementary amendments intended to provide the Secretary with broad discretion in the disposition of vessels acquired under Title XI. Congress explained that the 1972 amendment was intended to alter the nature of government backing and the corresponding nature of the Secretary's "rights in any security held by him relating to the guarantee security agreement with the obligor...." S.Rep. No.

---

**4.** Appellants maintain that Congress could have drafted the notwithstanding language to read "notwithstanding any other provision *of this chapter* or any other Act ..." if it intended to preempt other provisions within the Act itself. This is certainly true. *See, e.g.,* the Foreign Assistance Act of 1961, as amended, 22 U.S.C. § 2292(b); *see also Crowley Caribbean Transport,* 865 F.2d at 1282. However, in *Crowley,* this court found that "[t]he word *chapter* ... appears not to change the meaning [of the notwithstanding clause] in any pertinent way." *Crowley Caribbean Transport,* 865 F.2d at 1282 n. 1 (emphasis added). Contrary to appellants' assertion then, the language "notwithstanding any other provision *of this chapter or any other Act*" means the same thing as "notwithstanding *any other provision of law.*" The absence of the word "chapter" does not limit the scope of the preemption.

Appellants also contend that the "notwithstanding" language in § 1105(c) should be construed the same way as similar language in § 204(g) of the National Housing Act ("NHA"), 12 U.S.C.App. § 1710(g) (Supp.1990). For example, the Secretary of the Department of Housing and Urban Development's ("HUD") discretion under § 204(g) to dispose of HUD-acquired projects is limited by the specific statutory mandate to seek better housing conditions for low-income groups. *See* 12 U.S.C. § 1701t; *Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir.1980). In the NHA, Congress specifically declared "that in the administration of those housing programs authorized by this Act ... the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality...." 12 U.S.C. § 1701t; *see also* 42

U.S.C. § 1441 (setting forth the national goal to provide "a decent home and a suitable living environment for every American family"). This court found in *Russell* that although the Secretary of HUD does enjoy some level of discretion under the NHA, he must consider alternative methods of disposing of HUD property that will not conflict with the statutory mandate to provide low-income housing. *Russell,* 621 F.2d at 1041. The court disagreed with the Secretary of HUD's assertion that his discretion to dispose of property was only limited by the requirement to protect the solvency of NHA's insurance fund, not by the overall policies and objectives of the NHA. However, the court found that "[i]f disposition of the property as low-income housing is not feasible, then HUD has no obligation to dispose of the property in that manner." *Id.*

The Merchant Marine Act contains no specific statutory mandate requiring that the Secretary's disposal of Title XI vessels comport with the policies underlying § 508 and § 705 (to protect domestic competition and to maximize sale proceeds for the fund). Moreover, in this case the Secretary of Transportation concedes that its discretion under § 1105(c) is limited by the primary purpose of the Act to maintain an operating merchant marine; he is not attempting to dispose of vessels in a manner that conflicts with that statutory mandate. *Russell v. Landrieu,* therefore, does not pose the same issue as this case.

**5.** Before the 1972 amendment to Title XI of the Act, the statutory section containing the "notwithstanding" clause was set out in § 1105(d). When Congress amended the Act in 1972 it moved the clause to § 1105(c). *See* Pub.L. No. 92–507, 86 Stat. 909 (1972).

1137, 92d Cong., 2d Sess. 12 (1972), *reprinted in* 1972 U.S. CODE CONG. & ADMIN. NEWS 3851, 3861–62; H.R.Rep. No. 688, 92d Cong., 1st Sess. 12 (1971).

Appellants claim that the 1972 amendments were not intended to change minimum price restrictions on the sale of vessels under Title XI, despite the fact that the Congress deleted from § 1105(c) the clause setting a minimum price. In doing so, appellants rely on the House and Senate Reports for the amendment, which state: "no change in the present practice is contemplated." *Id.* We read that bit of legislative history, however, more generally as merely indicating that Congress did not intend to alter the Secretary's "present practice" of guaranteeing financing for the construction of vessels, only its form. We think it is reasonable to conclude, as the Secretary does, that the remark did not relate to the pricing of repossessed vessels subsequently sold, and, therefore, that Congress deleted the minimum price provision intentionally. The addition of the sentence "[t]he terms of the sale shall be as approved by the Secretary," to the end of § 1105(c) aids that construction by giving the Secretary wide discretion in setting sale price and terms that serve the purposes of the Act.[6]

Appellants correctly note that ordinarily competing sections of a statutory scheme should be construed to give maximum effect to all provisions. *See Citizens To Save Spencer County v. EPA*, 600 F.2d 844, 870 (D.C.Cir.1979). They contend that the Secretary's interpretation of § 1105(c) essentially nullifies § 705 and § 508. According to the Secretary, however, § 705 and § 508 continue to apply to transactions other than those governed by § 1105(c) and so have continuing effect independent of

§ 1105(c). Section 705 applies to the sale of vessels acquired by the Secretary under Title VII of the Act, which allows the government to fund construction of new vessels for eventual government ownership and sale. Section 705 also applies to Title V vessels acquired by the Secretary from buyers of Title V vessels who defaulted on their payments. Congress did not, incidentally, indicate that § 705 should similarly apply to Title XI vessels. Therefore, construing § 1105(c) to preempt the minimum price restriction in § 705 does not nullify the impact of that section.

Section 508 provides the Secretary with the authority to scrap vessels or to sell them for scrap once the Secretary determines that the vessels are of insufficient value to warrant continued operation. The purpose of § 508 is to remove obsolete vessels from the United States Merchant Marine. 46 U.S.C. App. § 1158. The competitive restrictions in § 508, which preclude scrapped vessels from competing in foreign commerce for ten years, do not apply to vessels sold with the intention of continued operation; those restrictions apply only to vessels sold with the knowledge that they are going to be scrapped, not to be used to compete against other U.S.-flag ships. For example, under § 507 of the Act, the Secretary may authorize "the construction and sale of a new vessel to *replace* a vessel then operated in foreign trade or domestic trade, which in the judgment of the Secretary of Transportation should be replaced because it is obsolete or inadequate for successful operation in such trade" 46 U.S.C. App. § 1157 (emphasis added); *see also* 46 U.S.C. App. § 1160 (acquisition of obsolete vessels). Because § 508 applies to vessels scrapped and re-

---

6. With respect to our concurring colleague's criticism of this brief discussion of the legislative history of § 1105(c), we note only that we are doing so in response to a specific argument made by appellants based on their interpretation of the same history (Appellants' Brief at 32–33). Although we agree with our colleague that the meaning of § 1105(c) is clear, appellants' interpretation of the legislative history, if adopted, might raise a question of whether the meaning is so plain, after all. *See Consumer*

*Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (plain language of the statute is regarded as conclusive "[a]bsent a clearly expressed legislative intention to the contrary"); *see also Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989). For that reason, we choose to reject rather than to ignore their argument that this is so.

placed under § 507, it operates without reference to § 1105(c).

Appellants also assert that § 508 applies to vessels sold for "scrap value" in addition to vessels sold for purposes of scrapping. Because the vessels sold to Belmont were sold for less than scrap value, appellants claim that § 508's restrictions should apply. Appellants point to no evidence in the plain language, the legislative history, or the purpose of the statute to support their contention that that is how § 508 must be read. The Secretary has decided in his discretion that § 508 does not apply to the sale of repossessed vessels under § 1105(c), and the issue before us is whether the Secretary's decision is reasonable. *See Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. We hold that it is.

Overall, the Secretary's interpretation of his authority to sell repossessed vessels is fully consistent with the purposes of the Act. The primary purpose of the Act was expressly stated by Congress: "It is declared to be the policy of the United States to foster the development and encourage the maintenance of ... a merchant marine." 46 U.S.C. § 1101. The sale of vessels in this case comports with this primary purpose. As appellants point out, however, a further purpose of the Act (as evidenced by § 508 and § 705) is to protect unsubsidized U.S. shipowners from the unfair competition of subsidized U.S. shipowners. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 586–87, 100 S.Ct. 800, 808–09, 63 L.Ed.2d 36 (1980) (Congress was concerned about "the entry of subsidized vessels into the domestic trade" because unsubsidized vessels would be "unable to compete with new vessels enjoying the benefits of the 1936 Act."). Yet another goal in the Act is to maximize the proceeds from the sale of Title XI vessels in order to maintain the solvency of the revolving fund. Although we agree with appellants that § 1105(c) does not permit the wholesale disregard of the underlying policies of the Act, the Secretary has broad discretion to harmonize the provisions in a way that is consistent with the Act's overarching purpose. *See Seatrain,* 444 U.S. at 585, 100 S.Ct. at 808 (holding that Congress intend-

ed to give the Secretary broad discretion to oversee the administration of the Act.). The Secretary did just that when he decided that keeping vessels operating in this instance was more important than maximizing profits and protecting domestic competition.

■ Congress gave the Secretary "broad authority to oversee administration of the Act." *Seatrain,* 444 U.S. at 585, 100 S.Ct. at 808. Where, as here, Congress has conferred such broad discretion on an agency, the agency's interpretation must be accepted "unless it is manifestly unreasonable." *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 174 (D.C.Cir.1982). Although the terms of the Secretary's sale to Belmont are in some tension with the policies underlying § 705 and § 508, they are not inconsistent with the Act's cardinal goal: to maintain an operating merchant marine. We agree with the district court that "[i]t is neither arbitrary nor unreasonable for [the Secretary] to favor an operating vessel over the money generated by scrapping it." Mem. op. at 20. In sum, there is no evidence that Congress intended the "notwithstanding" clause to preempt only laws outside of the Merchant Marine Act (a necessary prerequisite to rebut the plain inference that Congress meant to preempt *all* other provisions of law, *see Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)), and the Secretary's interpretation of its discretion under § 1105(c) is reasonable. We will consequently defer to his interpretation. *See Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

## IV. CARGO PREFERENCE ACT CLAIM

■ Appellants also sought declaratory relief in the district court from future competition by Belmont for preference cargo contracts under the Cargo Preference Act of 1954. *See* 46 U.S.C. App. § 1241(b). Appellants claim that the Secretary is required to augment bids to reflect capital costs absorbed by the government in the sale of vessels under § 1105(c) when the sale price is below the minimum imposed

by § 705. They base their claim on the Secretary's regulations, which prevent recipients of operating-differential subsidies ("ODS") from gaining an advantage over unsubsidized vessels when competing for cargos reserved to the U.S.-flag vessels under the Cargo Preference Act. *See* 46 C.F.R. § 381.8 (1989). Having already found that the § 705 minimum price provision does not apply to § 1105(c), we cannot agree with appellants that the vessels were sold below a "minimum price" to create a "hidden subsidy." Therefore, the Secretary is under no obligation to augment Belmont's bids for preference cargo.

## V. CONCLUSION

The Secretary's decision to sell repossessed vessels under § 1105(c) to Belmont for a price below the minimum sale price computed by § 705 and without restrictions on competition set forth in § 508 was consistent with a reasonable interpretation of the discretion conferred on the Secretary by § 1105(c). When the Secretary sold the vessels to Belmont under § 1105(c), he balanced the conflicting policies underlying § 508 and § 705 with the overall purpose of the Act to maintain an operating merchant marine, an exercise that is completely within the Secretary's discretion under the Act. In addition, the Secretary was not required, by his own regulations or by the Act, to augment Belmont's bid to transport preference cargo. In sum, we affirm the district court's dismissal on all counts.

It is so ordered.

BUCKLEY, Circuit Judge, concurring:

I concur in all but the court's discussion of the legislative history of section 1105(c). As the court readily acknowledges, we deal here with statutory language that is clear on its face, and with an agency interpretation that is consistent with that language. I see no need to probe further. "[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms[,]" *United States v. Ron Pair Enterps., Inc.,* 109 S.Ct. 1026, 1030 (1989) (internal quotes and citation omitted); when "the terms of a statute [are] unambiguous, judicial inquiry is complete," *Burlington No. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461 (1987) (internal quotes and citation omitted).

As it is, the court's reading of the legislative tea leaves matches speculation (appellants') against speculation (the court's) in an attempt to divine what Congress might have had in mind when, in 1972, it deleted the minimum price provision from the section. In my view, the only reliable evidence of the section's meaning is its language. As the court acknowledges, that language is unambiguous. Moreover, Congress used a formulation ("notwithstanding any other provision of law") that, as the court points out, we have consistently found to mean what it says. That should have been the end of our inquiry.

I disassociate myself from the court's consultation of legislative history not only because it is unnecessary, but because I am wary of the practice. The legislative process lends itself to manipulation, and the clues to statutory meaning on which courts are prone to rely can mislead as well as illuminate.