ENERGY TRANSPORTATION GROUP, INC., Petitioner,

v.

MARITIME ADMINISTRATION and United States of America, Respondents,

Argent Companies, Cabot LNG Shipping Corporation, Shell International Marine Limited, Shell Gas Nigeria, B.V., Shell Bermuda (Overseas) Limited, Shell International Gas Limited (Shell Appellees), Intervenors.

CABOT LNG CORPORATION

v.

Samuel K. SKINNER,

Energy Transportation Group, Inc., Appellant.

SHELL INTERNATIONAL MARINE LIMITED, et al.

v.

MARITIME ADMINISTRATION of the UNITED STATES, et al.,

Energy Transportation Group, Inc., Appellant.

ENERGY TRANSPORTATION GROUP, INC., Appellant,

v.

Samuel K. SKINNER, et al.

Nos. 90–1547, 90–5346, 90–5363 and 90–5392.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1991.

Decided Feb. 21, 1992.

Samuel Rosenthal, with whom David A. Strauss, Washington, D.C., was on the brief, for petitioner in Nos. 90–1547, 90–5346, 90–5363 and 90–5392. Preston Brown, Washington, D.C., also entered an appearance for petitioner.

Jeffrey Clair, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Michael Jay Singer, Atty., Dept. of Justice, and Rosalind Avnet Lazarus, Atty., Dept. of Transp., Washington, D.C., were on the brief, for respondents in all cases. Mary Bennett Reed, Atty., Dept. of Transp., Washington, D.C., also entered an appearance for respondents.

William E. McDaniels, with whom Bruce F. Kiely and Thomas Milch, Washington, D.C., were on the joint brief, for intervenors in No. 90–1547 and appellees in Nos. 90–5346, 90–5363 and 90–5392. Heidi K. Hubbard, Laurence Shore, Richard M. Cooper and Mark R. Merley, Washington, D.C., also entered appearances for intervenors.

Before: BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

After prolonged efforts, the Maritime Administration in 1990 sold off three tankers designed for the transportation of liquified natural gas ("LNG"). Energy Transportation Group, Inc. ("ETG") here attacks the sale, asserting that the Maritime Administration failed to use competitive bidding, in violation of the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471–544, and that its conduct of the sale was arbitrary and capricious. It also contends that the purchasers of two of the three tankers, the Argent Marine Companies, were not qualified purchasers because they were not U.S. citizens within the meaning of the Shipping Act of 1916, 46 U.S.C. app. § 802, and the Merchant Marine Act of 1936, 46 U.S.C. app. §§ 1151 & 1244. We consider three appeals from decisions of the district court and one direct petition for review; we dismiss all four for lack of district court or appellate jurisdiction.

\* \* \*

The Maritime Administration acquired the three disputed tankers in 1986, after the owners defaulted on federal loans made under Title XI of the Merchant Marine Act of 1936, 46 U.S.C. app. §§ 1273(a) & 1274(a). It immediately put the tankers up for sale, issuing bid solicitations in April 1986 and April 1987, which yielded no offers from suitable purchasers, and a third one in September 1987. This last solicitation stated that purchasers had to be U.S. citizens within the meaning of 46 U.S.C. app. § 1244, and that the Maritime Administration could not "assure" parties who did not "respond" to the solicitation that they would be contacted again in the matter. ETG was sent all three bid solicitations but responded to none.

In October 1987 an affiliate of Shell Oil submitted a bid proposal on behalf of a U.S. citizen to be named later; Cabot LNG Corporation also expressed an interest in the tankers but at the time did not submit a bid. In mid-October the Maritime Administration sent a letter advising the parties that had expressed interest that it would consider any additional "best and final" offers submitted by the end of the month. No new bid was submitted, and the Maritime Administration ultimately accepted Shell's proposal in February 1988 and completed a purchase option agreement with Shell's U.S. citizen nominees, the Argents, in October 1988. Cabot submitted a firm offer for the vessels in June 1988, but the Maritime Administration replied that they were no longer available.

In August 1989 the Maritime Subsidy Board (three specified officials of the Maritime Administration acting in that capacity, 49 CFR § 1.67(c) (1990)) approved the transfer of title of the vessels to the Argents. Cabot challenged the sale before the agency and in the district court, alleging flawed bidding procedures and the Argents' non-citizenship. The Maritime Administration meanwhile began its own investigation and, in March 1990, terminated the purchase agreement on the ground that the Argents were not citizens because they were effectively controlled by Shell's affiliate. The Argents petitioned this court for review and also filed a cross-claim against the Maritime Administration in Cabot's suit; Shell filed a district court action that was consolidated with Cabot's.

In February 1990 ETG entered the picture, writing to the Maritime Administration to express its interest in the vessels in the event that the sale to the Argents should be cancelled and to propose negotiations looking toward a purchase. (ETG's letter spoke of "a price in the range of $80 million each"—$65 million per vessel more than the Argent/Shell offer, a differential that ETG makes much of in its briefs. Its formal bid, however, in October 1990, was $25 million per vessel, more but not vastly more than the ultimate selling price of $18 million per vessel.) ETG also sought to intervene in all the pending suits, but its motions to intervene were denied here, see *Argent Marine I, Inc. v. United States*, No. 90–1147, Order (D.C.Cir. July 16, 1990)

(per curiam), and in the district court, the latter expressly finding ETG's motions untimely and ETG without standing, see *Cabot v. Skinner*, Civ. Nos. 89–2711 & 90–0788, Order at 3–5 (D.D.C. Oct. 4, 1990).

All the parties but ETG managed to resolve their differences in September 1990. The Maritime Subsidy Board approved the Maritime Administration's agreement to sell the vessels for about $18 million each, one to Cabot and the other two to the Argents; Cabot, Shell, and the Argents agreed to dismiss all of their pending claims against the Maritime Administration. ETG petitioned the Secretary of Transportation for review of the Board's order approving the sale, asking that he direct the Maritime Administration to rebid the vessels. The Secretary denied review, however, holding that the government was not required to rebid because it had discretion to negotiate a private sale to settle the litigation, citing § 1105(c) of the Merchant Marine Act of 1936, 46 U.S.C. § 1275(c). *Argent Marine I, Inc.* (Sec.Transp. Nov. 14, 1990), *reprinted in* Joint Appendix ("J.A.") at 1096.

ETG also filed a complaint in the district court seeking relief under § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702. As in its administrative filing, ETG claimed that the Maritime Administration had violated the Federal Property Act and the citizenship provisions of the Shipping and Merchant Marine Acts, and that its conduct was arbitrary and capricious. The district court dismissed ETG's claims; it held that ETG had no standing because it had not participated in the original bidding process and that the court of appeals had exclusive jurisdiction of the citizenship issues. *ETG v. Skinner*, 752 F.Supp. 1 (D.D.C.1990). ETG appeals that decision as well as the district court's denial of its motions to intervene in the consolidated Cabot and Shell cases. It also petitions this court pursuant to the Hobbs Act, 28 U.S.C. § 2342(3)(A), for review of the Maritime Subsidy Board's September 1990 decision as to citizenship under § 2 of the Shipping Act of 1916, 46 U.S.C. app. § 802.

\*    \*    \*

We first dismiss as moot the appeals from the district court orders denying intervention. The complaints in the underlying litigation were dismissed by agreement of the parties pursuant to the settlement, so there is no longer any action in which to intervene. See *Tosco Corp. v. Hodel*, 804 F.2d 590, 592 (10th Cir.1986); *United States v. Ford*, 650 F.2d 1141, 1142–43 (9th Cir.1981). This dismissal of course does not foreclose any of ETG's claims against the Maritime Administration that might otherwise be viable.

Second, before turning to ETG's lack of standing for either its Hobbs Act petition or its district court suit, we note a peculiarity in the first and a possible additional jurisdictional defect in the second. The oddity of the Hobbs Act claim is that it attacks the Maritime Subsidy Board's decision, which was non-final until the Secretary acted, rather than the Secretary's (final) decision. See 46 CFR § 202.1 (1991) (Maritime Subsidy Board decisions do not become final until the Secretary either grants review or fails to act within 15 days after a reply is due); see also 28 U.S.C. § 2342(3)(A) (conferring exclusive jurisdiction on the D.C. Circuit to review "all rules, regulations, or *final orders of . . . the Secretary of Transportation* issued pursuant to section 2 . . . of the Shipping Act, 1916") (emphasis added). As the Secretary had acted before the petition was filed, the defect was probably non-jurisdictional, compare *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C.Cir.1989) (challenge filed during pendency of challenger's petition for reconsideration is "incurably premature"), but it has led ETG to focus its briefs more on the Maritime Subsidy Board's decision than on the Secretary's.

As to ETG's APA suit, we note a potential jurisdictional defect in addition to the problem of standing. The APA claim was filed on October 11, 1990, while ETG's petition for review of the Maritime Subsidy Board's order was pending before the Secretary. (The Secretary issued his decision on November 14, 1990, and the district judge's decision followed, on November 21, 1990.) As the APA requires "final agency

action" in cases in which § 702 is the sole basis for jurisdiction, see 5 U.S.C. § 704; *Lujan v. National Wildlife Federation,* —— U.S. ——, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990), *TeleSTAR's* rule on incurable prematurity may apply. There we ruled that any petition for review filed while petitioner's request for reconsideration was pending before an agency could not ripen even if the agency completed reconsideration while appellate review was pending. We explained that we were establishing

> this bright line test to discourage the filing of petitions for review until after the agency completes the reconsideration process. If a party determines to seek reconsideration of an agency ruling, it is a pointless waste of judicial energy for the court to process any petition for review before the agency has acted on the request for reconsideration.

*TeleSTAR, Inc. v. FCC,* 888 F.2d at 134. Unless there is some relevant difference between ordinary reconsideration and the sort of hierarchical review involved here (Secretary over Maritime Subsidy Board), or some special exception applies, cf., e.g., *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 714 F.2d 163, 168–69 (D.C.Cir.1983) (finality may be waivable if important constitutional or statutory right has very clearly been violated), *TeleSTAR* would seem applicable. But compare *Sacks v. Rothberg,* 845 F.2d 1098 (D.C.Cir. 1988) (allowing premature appeal of a district court order to ripen). However, as the issue has not been briefed and we must dismiss for want of standing, we need not decide the question here.

\* \* \*

■ We now turn to ETG's standing. In order to establish standing under Article III of the Constitution, plaintiffs must show that (1) they have suffered personal injury-in-fact, (2) the injury is fairly traceable to the defendant's allegedly illegal conduct, and (3) the injury is likely to be redressed by a favorable decision. *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* —— U.S. ——, 111 S.Ct. 2298,

2306, 115 L.Ed.2d 236 (1991); *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). ETG first argues that it has suffered injury as a "disappointed bidder" under *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 864 (D.C.Cir.1970), and its progeny. While we have characterized the disappointed bidder's injury as being to its "right to a legally valid procurement process", *National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237 (D.C.Cir.1987), that characterization does not relieve the plaintiff of the need to show a causal link between its loss and the agency's illegal conduct. There could be no real injury—certainly no injury "fairly traceable" to the allegedly illegal act—unless the plaintiff would have had some chance of prevailing in a bidding free of the alleged illegalities. One way in which we have screened out plaintiffs who lacked that prospect has been to require that a plaintiff has been " 'within the zone of active consideration' for the bid's award." *Id.* at 1238 n. 12 (quoting *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983)). As *CACI* put it, the disappointed bidder "need demonstrate only that if its bid had been fairly and honestly considered, 'there was a substantial chance that [it] would receive an award' ". 719 F.2d at 1574 (citations omitted). "[O]therwise nuisance suits could handicap the procurement system", *National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1053 (D.C.Cir. 1989), and the courts would be filled with cases not justiciable under Article III.

■ Until its first expression of interest, in February 1990, ETG cannot have been a "disappointed bidder"; until then it deliberately did not participate in the bidding process. It failed to respond to any of the Maritime Administration's three solicitations with either an expression of interest or a firm bid. Though the Maritime Administration gave ETG ample opportunity to bring itself within the zone of active consideration, compare *CC Distributors, Inc. v. United States,* 883 F.2d 146, 150–51 (D.C.Cir.1989) (government agency failed to initiate procurement process at all), ETG

failed to do so—at least for two years and five months after the September 1987 bid solicitation. Perfect fairness and legality on the Maritime Administration's part would not have given ETG a "substantial chance" of securing the tankers; with ample notice, it sat by while the process rolled forward. Its injury cannot fairly be traced to the Maritime Administration's choice of bidding procedures or slackness in checking out the bidders' citizenship.

ETG contends that its bid in February 1990 qualifies it as a "disappointed bidder". At that stage, of course, it *sought* to get within the zone of consideration, and the Maritime Administration kept it out. But we think such a belated effort to get involved could only afford ETG disappointed bidder status if either (1) the Maritime Administration in fact initiated a new bidding process, thus relaxing the warning in its September 1987 solicitation that non-respondents could not expect to be contacted in the future, or (2) the law required it to initiate a new process. Neither condition was fulfilled.

The activities running from the Maritime Administration's cancellation of the sale to Argent/Shell in March 1990 to the settlement agreement in September 1990 cannot possibly reflect the start of a new process. As the district court found:

> The "1990 sale" did not take place in a vacuum. It was brought about only as a result of the litigation that the parties have been engaged in throughout the last year, and that litigation was brought about only as a result of the Maritime Administration's original attempt to dispose of the LNG vessels through its 1986, 1987, and 1988 solicitations.

*ETG v. Skinner*, 752 F.Supp. at 6; see also *id.* at 6–7.

Before the settlement, the Maritime Administration faced a battery of mutually exclusive claims by Cabot, the Argents and Shell. Cabot was seeking a judicial declaration that it was the sole eligible bidder and an order that the Maritime Administration negotiate with it. *Cabot v. Skinner*, Civ. No. 89–2711, Complaint for Declaratory Judgment and Injunctive Relief (D.D.C.

Sept. 29, 1989), *reprinted in* J.A. at 210. The Argents were seeking a judgment requiring the Maritime Administration to honor the original (invalidated) purchase agreement and an injunction barring the Maritime Administration from rebidding. *Cabot v. Skinner*, Argent Marine Companies' Cross–Claim, Civ. No. 89–2711 (D.D.C. Apr. 18, 1990). And Shell was seeking declaratory and injunctive relief from the Maritime Administration's invalidation of the original purchase agreement. *Shell v. Maritime Administration*, Civ. No. 90–0788, Complaint (D.D.C. Apr. 4, 1990), *reprinted in* J.A. at 453. The settlement agreement and resulting sale were conditioned upon dismissal of these claims. See J.A. at 622–23. Far from constituting a new process, they were just a disentangling of the old.

■ The Maritime Administration's decision to include Cabot in the settlement—but not ETG—does not alter this conclusion. Cabot had expressed interest in the vessels in 1988, whereas ETG had not. Furthermore, the Maritime Administration was being sued by Cabot and could reasonably determine that including Cabot (but not ETG) in the settlement was necessary to end the litigation. The inclusion of Cabot was neither arbitrary nor the implicit start of a new bidding process.

■ ETG argues that the Maritime Administration made "binding admissions" that the 1990 sale was completely separate from the earlier solicitations. Of these the closest to having any persuasive value is the Secretary's decision that the relevant date for determining satisfaction of the statutory requirements was the settlement date, September 18, 1990. See *Argent Marine I, Inc.* at 11, *reprinted in* J.A. at 1106; compare ETG Brief at 19–20. But the Secretary's view that the settlement date was key for satisfaction of statutory requirements hardly warrants a conclusion that the settlement initiated a new disposition process.

■ Finally, ETG points to some language of the Maritime Subsidy Board's adverse decision on the Argents' citizenship

in March 1990. There the Board addressed the question of cure and said, rather obscurely we think, that "where, as here, a critical element of a bid notice is not met at the time of the award, the deficiency may not be cured subsequent to the bid closing date." J.A. at 380. This does not get ETG very far, as it can be reconciled with the Maritime Administration's and the Secretary's later conduct: rather than awarding the sales contract to the Argents, they opened it up again to the one party to whom they imputed disappointed bidder status—Cabot. The statement neither constituted a reopening to all the world, nor committed the Maritime Administration to such a reopening.

Even if the Maritime Administration did not start a new bidding process for the world at large, ETG argues, the Federal Property Act bound it to do so. Since ETG's February 1990 letter suggests ample readiness to compete, and the Maritime Administration does not even hint at any disabling characteristic, such a reopening would surely have given ETG the "substantial chance" of success required by *CACI*. Cf. *Aero Corp. v. Department of the Navy*, 540 F.Supp. 180, 183, 201–03 (D.D.C. 1982) (standing to challenge alleged violation of statute requiring solicitation of bids from maximum number of qualified sources). In essence, the argument is that the Federal Property Act creates "legal rights, the invasion of which creates standing", *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (citations and footnotes omitted). Prudential standing, moreover, if we needed to reach it, would likely turn on the same point. In *Gosnell v. FDIC*, 938 F.2d 372 (2d Cir.1991), the court noted that the cases in which courts granted standing to disappointed bidders involved statutes "contain[ing] specific procedural guidelines protecting the bidders' rights." *Id.* at 376. As the statute in question instead gave the FDIC "broad discretion in disposing of the assets under its control", *id.*, the court found no intent to afford a right of action to would-be purchasers. See also *Warth v. Seldin*, 422 U.S. at 500, 95 S.Ct. at 2205 (constitutional and prudential standing issues may merge and resolve into whether the "provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief").

Thus, ETG would have standing if it had a legal entitlement to a new round of bidding. ETG finds that entitlement in the Federal Property Act, which requires the government to dispose of "surplus property" by public advertising for bids, 40 U.S.C. § 484(e), and provides that "[t]he authority conferred by this Act shall be in addition and paramount to any authority conferred by any other law and shall not be subject to the provisions of any law inconsistent herewith," 40 U.S.C. § 474. Because of the force of other statutes seeming to displace § 484(e), ETG stresses § 474(16), which imposes a weaker burden on the Maritime Administration, requiring that it "shall to the maximum extent that it may deem practicable, consistent with the fulfillment of the purposes of such programs and the effective and efficient conduct of such activities, coordinate its operations with the requirements of this Act".

There are two problems with this argument, each insuperable. First, even if § 484(e) or § 474(16) were generally applicable to the Maritime Administration's vessel dispositions, a grant of discretion in the Merchant Marine Act of 1936 explicitly overrides all other provisions of law relating to the disposition of the sort of vessel involved here. Second, a more specific provision of the Federal Property Act, 40 U.S.C. § 484(i), controls the disposition of vessels weighing 1500 gross tons or more.

Section 1105(c) of the Merchant Marine Act of 1936 grants the Secretary broad discretion as to the means of disposing of repossessed vessels such as those involved here:

*Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of property by the United States, the Secretary shall have the right, in his discretion, to complete, recondition, reconstruct, renovate, repair, maintain, operate, charter, or sell any*

property acquired by him pursuant to a security agreement with the obligor or may place a vessel in the national defense reserve. *The terms of the sale shall be as approved by the Secretary.* 46 U.S.C. app. § 1275(c) (emphasis added). In *Liberty Maritime Corp. v. United States,* 928 F.2d 413 (D.C.Cir.1991), we read this broadly, saying that "the 'notwithstanding' clause appears to give the Secretary the broadest possible discretion", *id.* at 416 (citing cases giving broad reading to similar "notwithstanding" clauses). There the appellants conceded that § 1105(c) overrode *general* provisions such as the Federal Property Act but claimed a failure to preempt other provisions of the Merchant Marine Act itself. We rejected the *Liberty Maritime* appellants' claim, and here we find ETG's effort to confine the preemption no more persuasive.

ETG argues that as § 1105(c) predated the Federal Property Act by thirteen years, its "notwithstanding" clause could not preempt it. But even if we made the dubious assumption that a "notwithstanding" clause should be viewed as working backwards only, we could not draw the inference ETG seeks. Section 1105(c) was reenacted on two occasions, with various amendments, after the Federal Property Act's enactment in 1949. See Pub.L. No. 83–781, 68 Stat. 1267, 1274 (1954); Pub.L. No. 83–288, 67 Stat. 626, 627 (1953).[1]

■ In any event, we agree with the government that the sales in question are governed by *another provision of the Federal Property Act,* 40 U.S.C. § 484(i), rather than the "surplus property" section that ETG cites, § 484(e). Section 484(a) specifically states that "except as otherwise provided in this section, the Administrator [of General Services] shall have supervision and direction over the disposition of sur-

plus property". Section 484(e) is not such an exception, as it deals only with disposal of surplus property "by the Administrator," 40 U.S.C. § 484(e)(1), and thus does not apply to dispositions by the Maritime Administration. Section 484(i), by contrast, focuses on the precise problem at hand—dispositions *by the Maritime Administration* of vessels weighing 1500 gross tons or more—and specifies that they "shall be disposed of only in accordance with the provisions of the Merchant Marine Act, 1936". As we have seen, § 1105(c) of that Act grants the Secretary broad discretion in the disposal of surplus vessels.

ETG suggests that 46 U.S.C. app. § 1158 somehow undercuts this reading of § 484(i). But § 1158 governs only certain vessels that the Secretary determines are "of insufficient value for commercial or military operation to warrant [their] further preservation", and thus, though seeming to carve an exception out of § 1105(c), has no application to the current sales. All roads, then, lead to § 1105(c) and away from §§ 484(e) and 474(16) of the Federal Property Act.[2]

■ ETG also alleges various defects in the district court's review of evidence relevant to the standing inquiry. See Petitioner's Brief at 37–41; Reply Brief at 17–19. To the extent there was any error, it was harmless. ETG's first set of contentions add up to a claim that the district court improperly determined that the Maritime Administration here violated a longstanding practice of competitive bidding. But even assuming this were true, it would not help ETG, as our statutory interpretation is quite independent of prior practice. Cf. *Rust v. Sullivan,* — U.S. —, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991) (deference accorded agency interpretations con-

---

1. Indeed, the phrase that the "terms of the sale shall be as approved by the Secretary" was added in a 1972 amendment, Federal Ship Financing Act of 1972, Pub.L. No. 92–507, 86 Stat. 909, 914, to replace language providing that the Secretary "may sell [the property] upon competitive bids for not less than the minimum sales price provided by the Merchant Marine Act, 1936, as amended", 68 Stat. at 1274. See *Liberty Maritime,* 928 F.2d at 417.

2. Despite ETG's suggestion to the contrary, clearly we cannot find a legally enforceable obligation to rebid in the government's statement at a status conference in the *Cabot* litigation on March 22, 1990, "It's the government's *intention at this time* to rebid the ships, given the opportunity." J.A. at 414 (emphasis added).

stituting "sharp break" from prior constructions); *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 863, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984) ("An initial agency interpretation is not instantly carved in stone.").

■ ETG's second procedural argument is that because the district court failed to unseal various portions of the administrative record (supplied to ETG in redacted form), its decision fails to constitute review on the whole record. Petitioner's Brief at 39–41. Of course the district court's decision and ours do not purport to constitute review of the Maritime Administration's decision; they are merely determinations that ETG lacks standing to secure review. ETG does not hint at any way in which unsealing might conceivably establish either that a full reopening of the bidding occurred or that such a reopening was legally required.

■ Finally, ETG argues that it has standing to challenge the Argents' citizenship regardless of its failure to bid, as it is a U.S. citizen that "owns and operates commercial vessels, including LNG carriers". Petitioner's Brief at 22. But those circumstances do not show enough of a competitive injury to satisfy Article III. Under the terms of the 1990 sale, the Argents and Cabot must (with limited exceptions) use the tankers to transport LNG to the U.S. for the duration of the original federal construction subsidy contracts, J.A. at 620–21, i.e., until 1998 or 1999, *Argent Marine I, Inc.* at 14, *reprinted in* J.A. at 1109. ETG has conceded that (1) it presently does not carry LNG shipments to the U.S., see Mem. in Opp. to the Intervenors' Motion to Dismiss, Civ. No. 90–1547 at 17 (Jan. 22, 1991); and that (2) all of its tankers are committed in long-term contracts, see Affidavit of Kimball C. Chen, Vice–President/Director, ETG (Sept. 21, 1990), *reprinted in* J.A. at 358, ¶ 4. Although ETG asserts that it is currently involved in negotiations with potential LNG suppliers, it does not claim to have made any arrangements for supply or to have acquired access to any of the existing (privately-owned) U.S. port facilities suitable for LNG importation. In short, it can only suffer competitive harm if it enters the market for carrying LNG to the U.S. in the future, and it has shown little evidence that such entry is probable. This potential harm is too speculative to satisfy Article III's requirement that the injury be "distinct and palpable", *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206, not "conjectural" or "hypothetical", *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); accord *United Transportation Union v. ICC,* 891 F.2d 908, 911–14 (D.C.Cir.1989). Compare *Sea–Land Service Inc. v. Dole,* 723 F.2d 975, 977–78 (D.C.Cir.1983) (injury requirement satisfied where challenged action benefits competitor who is (or will be after the challenged action) in direct competition with plaintiff).

The only competitive injury ETG appears to have suffered is that it did not acquire the vessels that it could have used to enter a new line of business. That injury, however, even if sufficiently concrete, was caused by ETG's failure to submit a bid until much too late (given our analysis above); it cannot be characterized as "fairly traceable" to illegal action by the Maritime Administration. Cf. *America West Airlines, Inc. v. Burnley,* 838 F.2d 1343 (D.C.Cir.1988) (per curiam) (airline had no standing to challenge other airlines' merger because neither of its alleged competitive injuries, difficulties in expanding eastward and in obtaining landing slots at La-Guardia and National Airports, was caused by government approval of the merger).

\* \* \*

We dismiss all of the appeals here. We hold that ETG's appeals of the district court's orders denying intervention are moot and dismiss ETG's Hobbs Act petition for want of standing; we affirm the district court's order dismissing ETG's APA suit for lack of standing.

*It is so ordered.*